In a collision between a taxicab of Toye Bros. Yellow Cab Co., a partnership, and a passenger bus of New Orleans Public Service, Inc., Mrs. Mary Kidd Seiner, who, with several other persons was a passenger in the taxicab, received personal injuries. She is seeking a solidary judgment against Toye Bros. Yellow Cab Co., the individual members of that partnership, and New Orleans Public Service, Inc., alleging that the accident was caused by the joint negligence of the operators of the two vehicles.
Each of the defendants denies that there was any negligence in its employee and claims that the fault lay entirely with the operator of the other vehicle.
In the Civil District Court for the Parish of Orleans there was judgment in favor of Mrs. Seiner and against Toye Bros. Yellow Cab Co. and the individual members of that partnership for $1,000, with interest from judicial demand and for costs, and in favor of New Orleans Public Service, Inc., dismissing the suit as against *Page 190 
that corporation. Both Toye Bros. Yellow Cab Co. and Mrs. Seiner have appealed.
Toye Bros. contends that the judgment should be reversed and the suit as against it dismissed, and Mrs. Seiner maintains that she should have judgment against New Orleans Public Service, Inc., as well as against Toye Bros. Yellow Cab Co., and that the amount of the judgment should be increased.
At about 4:35 o'clock on the afternoon of February 9, 1942, the taxicab in which Mrs. Seiner was a passenger was on its way out Franklin Avenue towards Lake Pontchartrain and the bus of the New Orleans Public Service, Inc., was going up Galvez Street from the lower part of the city towards the business section. Franklin Avenue is a wide thoroughfare having two roadways separated by a neutral ground on which there are street car tracks. At the corner of Franklin Avenue and Galvez Street there are two co-ordinated electric semaphore traffic control lights.
Plaintiff makes the same general charges of negligence against the two drivers. She says that both violated the provisions of the City Traffic Ordinance No. 13,702 in driving at an excessive rate of speed, in failing to keep a proper lookout for vehicles on the intersecting street and in failing to stop before entering the intersection.
Each of the defendants denies all negligence on the part of its driver and charges that the other driver was guilty of the various derelictions alleged by plaintiff and each specifically charges that as its vehicle entered the intersection the semaphore lights were green or favorable towards it but red or unfavorable towards the other.
It was shown that since the accident the operator of the taxicab has entered the Military Service and that at the trial "He was abroad somewhere", and that, therefore, he could not be produced as a witness.
That the taxicab entered the intersection while the light towards it was red there can be no doubt at all. By an overwhelming preponderance of evidence the record shows this, and Mrs. Seiner, the plaintiff, says that although she did not actually see the light, she is certain that when the cab "speeded up in order to try to make that light * * * the bus already had a go signal on the downtown side to go over" and she added: "That is the reason (for) the crash * * *." The driver of the bus and several of the passengers in it testified that, as it reached the corner of Franklin Avenue, it stopped to pick up passengers, and also because the light towards it was red. This is also testified to by a witness, Estrada, who was driving his automobile up Galvez Street and who brought it to a stop alongside the left side of the bus. He, too, stopped because of the red light. All these witnesses and others say that after the light changed to green, Estrada started his automobile and preceded the bus across Franklin Avenue.
Cavelier, the operator of the bus, had no recollection of having seen the Estrada car but, in all other particulars, he is in accord with these witnesses. All these witnesses say that then the bus also proceeded and that just as its front portion had reached the neutral ground, after completely crossing the lower side of Franklin Avenue, it was run into by the taxicab. Mrs. Seiner and the other witnesses all say that it struck the bus "somewhere near the middle."
By the testimony of two police officers who arrived shortly after the crash and by the operator of the bus, it is shown that the driver of the taxicab admitted that he had attempted to cross on a red light. Sgt. Reuther said that the taxicab chauffeur had "voluntarily stated that upon reaching the intersection he had a red light and the street was wet. He applied his brakes and hit the bus." Officer Gleaber confirmed the fact that the taxicab driver had admitted this. Referring to that driver, he said: "He told the Sergeant that the light was red and he tried to stop and skidded right into the side of the bus."
It is true that three witnesses testified that the light was unfavorable for the bus but we find various incredible statements in their testimony. We shall not go into detail except in the case of one of the witnesses. The evidence given by her would have been very damaging to the defense of New Orleans Public Service, Inc., were it not for the fact that she destroyed its effectiveness by showing such hostility toward that company as to cast suspicion upon her entire story. She claims that she was standing on the sidewalk on the upper side of Franklin Avenue, waiting for the bus, although she knew that the bus did not stop on that side, and that she saw the bus start while the light facing *Page 191 
it was red. She says that she walked across and shouted to the driver that it was entirely his fault and that he had started in the face of a red light. She adds that she was afraid that the driver could not hear her and, therefore, waited until he got out of the bus and then repeated the same statement to him, adding that she shook her finger at him and said: "I am going to give my testimony to the Yellow Cab driver * * *." A little later she said:
"It made me furious to think he crossed on a red light." She pretended to have great sympathy for New Orleans Public Service, Inc., saying that her father had once been employed by that company, and that she had never had a claim against it. On cross-examination she admitted that she had "fussed with them once in a while * * * because I have hurt my ankle.", but says that she did not tell the company about that and that at another time she "stepped in a big hole out at the end of Franklin Avenue but I did not take it to court." She was asked if there were any other occasions on which she had had controversies with the company, and she said "No, but I can tell you of a bus driver of their bus crossing a red light * * *". And she added that on this occasion too, she had tapped the driver on the shoulder and had said: "You are crossing a red light." She threw in the voluntary statement: "They are not well trained." It is very obvious that there had been some controversy between her and the said corporation concerning meter charges or something of that kind because she was asked if she had ever had any trouble with her meter and she said: "Oh, of course, the fuse blew out once and I called the Public Service, and I thought the fuse was sealed, but he said no." Just what this controversy was about we cannot tell but obviously there was some kind of dispute. At any rate, her whole testimony is so colored with animosity and was so discredited by the overwhelming preponderance of the evidence that we cannot accept her version as the correct one. The same may be said of the testimony of at least two others who insisted that the bus had crossed on a red light.
It is evident that the district judge felt as we do about this evidence and could not be convinced that the bus driver had started his bus in the face of an unfavorable light for, in his reasons for judgment, he said: "The injuries sustained by petitioner were caused through no fault or negligence of the New Orleans Public Service * * *." We agree with him in this and we find no fault whatever in the driver of the bus unless it be that he concedes that he did not see the taxicab until it reached a point about 20 or 25 feet from his bus.
Counsel for Toye Bros. was very critical of the bus driver because of the fact that he failed to see the taxicab as it neared the intersection and argues that even where the operator of a vehicle enters an intersection under the protection of a favorable light, it is negligence to fail to notice that another vehicle, moving in violation of the traffic right of way, is about to enter the same intersection. We have recognized that principle on several occasions and have held that even the protection of a favorable traffic light does not relieve the operator of a vehicle from all obligation, and that such a driver should see what any ordinarily prudent person would see and should act as an ordinarily prudent person would act. See Thomas v. Roberts, 144 So. 70 and Mrs. Virginia Culotta Kientz v. Charles Dennery, Inc., La.App., 17 So.2d 506, but that principle has application only where it appears that the conditions were such that a person exercising only slight care would have noticed the other vehicle, and that where it appears also that had the other vehicle been noticed it would have been apparent to the operator of the favored vehicle that the operator of the other car either could not or would not stop. We believe, of course, that one who has a favorable light is relieved of much of the obligation which otherwise is placed upon all drivers at intersections, and we have never believed or said that where the light is favorable there is a "strict" or an "extraordinary" obligation on the favored operator. All we have ever said is that merely because one has a green light he may not blindly proceed into obvious danger which even one exercising slight care would have noticed and would have avoided.
But, as is shown here, there was much other traffic on the street; at least one vehicle was ahead of the bus and two or more were crossing Franklin Avenue in the opposite direction. The bus driver had not proceeded for any great distance as had the operator of the defendant's car in the Kientz case. A bus requires considerable time to get under way and, therefore, it must have been several seconds after the *Page 192 
bus started before its front end reached the neutral ground. The cab was going at a moderate speed as is testified to by all of the witnesses, and at the last moment, as is testified to by Mrs. Seiner, herself, it speeded up and crashed into the side of the bus. Therefore, as the bus started to enter the intersection, the cab must have been some distance away — 40, 50 or more feet and, as it was going at a moderate speed, if the bus operator had seen it there would have been no reason for alarm, as he would have had the right to assume that it would stop and allow him to proceed. He does not say that he did not see it but merely that he does not remember having seen it. Possibly he did see it, and it was so far away that its presence was not registered in his recollection.
Under these circumstances he was in no way at fault in proceeding into the intersection.
We next consider the extent of the injuries of Mrs. Seiner. She was 46 years of age. She was treated only by Dr. M.O. Miller, physician of the defendant cab company. Being satisfied with his services, she called no physician of her own choosing. Dr. Miller says that when he first saw her, she was suffering with the following injuries: "She had an abrasion of the right leg about eight inches in length, measuring 1/2 to 1/4 of an inch wide beginning one inch below the knee cap, with a good sized hemotoma. By hemotoma is meant a blood tumor. An abrasion two inches above the right ankle, measuring one and one-quarter inches in length, about one-quarter inch wide. Abrasion with a small hemotoma just below the left knee." He thought it advisable to administer tetanus serum and sedatives and he stated that the injury to the right leg did not heal quickly; that "it was a delayed process of healing." Because there was some sloughing off of flesh at the abrasion on the right leg, he performed what seem to have been two simple operations, making incisions and cutting or scraping the clotted blood away from the wound. Mrs. Seiner remained in the hospital for fourteen days and then was confined to her home for about that same period of time and was finally discharged on April 17th, sixty-seven days after the accident. Dr. Miller says that at that time his records show that the right leg was "about healed." There was a scar on her leg which the doctor said was on the "upper third, anterior surface, that measured three inches in length." This scar in some places was over 1/2 inch wide and in others about 1/4 inch wide. He said: "This scar is smooth, it is noticeable, and I believe it will remain permanent." It is shown that as a result of it, Mrs. Seiner, ever since, has been careful to wear stockings which prevent its being seen and that this fact that she wears a rather unusual type of stocking is in itself noticeable. There were no medical expenses borne by Mrs. Seiner for the reason, as we have said, that these were all paid for by defendant, Toye Bros. Yellow Cab Co.
In view of these facts the amount awarded Mrs. Seiner below was correct. It should not be increased nor decreased.
The judgment appealed from is affirmed at the cost of Toye Bros. Yellow Cab Company.
Affirmed.
McCALEB, J., concurs in decree. *Page 202