TURNER, Justice.
This suit was brought by plaintiffs, Mr. and Mrs. Randall, for damages for the deaths of their two minor children arising out of an accident which occurred on November 11, 1957, at the intersection of Winn Avenue and Goodwood Avenue in the City of Baton Rouge, Louisiana. The accident involved a bus owned by Baton Rouge Bus Company, Inc., one of the defendants, and driven by John B. Miller in the course and scope of his employment, and a Plymouth automobile owned by Duncan-Randall Tire & Auto Supply, Inc., and driven by W. H. Randall, the grandfather of the deceased children. The Travelers Insurance Company, as the liability insurer of the Plymouth, was also made a defendant.
The district court found the driver of the bus and the driver of the car guilty of negligence proximately causing the accident and rendered judgment in favor of plaintiffs and against both defendants, in solido, for the total sum of $61,480.61. This award was based on $15,000 to each parent for the death of each child, plus $1,480.61 to the father for the funeral and burial expenses of both children. The judgment limited the liability of The Travelers Insurance Company to $50,000 in principal in accordance with its policy limits.
From this judgment both defendants appealed to the Court of Appeal, First Circuit, and plaintiffs answered the appeal asking for an increase in the award for the deaths of the minors. The Court of Appeal reversed the judgment of the district court insofar as it held the Baton Rouge Bus Company, Inc., solidarily liable with The Travelers Insurance Company and reduced the quantum to $49,480.61 or $12,000 per parent per child plus the funeral and burial expenses of $1,480.61.
Plaintiffs and The Travelers Insurance Company applied to this Court for writs of certiorari or review. Both applications were granted, and both writs in the case were consolidated.
The record shows that Goodwood Avenue, at the scene of the accident, runs generally in an easterly-westerly direction and is a two-lane black topped street. Winn Avenue runs in a general northerly-southerly direction and is also a two-lane black topped street, meeting Goodwood Avenue at a rather sharp angle from the northwest. On the north side of Goodwood Avenue and to the west of Winn Avenue is another two-lane black topped street, Sevenoaks Avenue, which runs into Goodwood Avenue at the same point as does Winn Avenue. *534 Goodwood Avenue is a through street and has the right of way over both the intersecting streets, and at the time of the accident traffic at the intersection was controlled by stop signs both on Winn Avenue and Sevenoaks Avenue. Prior to the collision W. H. Randall, accompanied by his two grandchildren, minor children of plaintiffs, was driving a Plymouth sedan in a southerly direction on Winn Avenue approaching Goodwood Avenue. At the same time a bus, owned and operated by the Baton Rouge Bus Co., Inc., was proceeding in a westerly direction on Goodwood Avenue, approaching its intersection with Winn Avenue. The undisputed evidence reveals that Randall, the driver of the Plymouth automobile, traveling at approximately 30 to 35 m. p. h. drove past the stop sign into Goodwood Avenue without slowing, swerving or stopping, and his vehicle was struck on its left side by the front end of the bus. As a result of the accident the two minor children, as well as Randall, were killed.
That the negligence of Randall was a proximate cause of the accident is not in dispute, his insurer, The Travelers Insurance Company, one of the defendants here, having conceded its liability. The questions to be resolved by this Court are whether the bus driver was also negligent, and, if so, was his negligence a proximate cause of the accident, as well as the propriety of the award.
The trial judge based his conclusion that the bus company was liable upon his finding that the bus driver, Miller, at the time of the accident was driving at an excessive rate of speed, failed to keep a proper lookout and failed to keep the bus under proper control at all times. The court of appeal, on the other hand, found that Miller did keep a proper lookout and was not negligent even though it agreed with the district court that the bus was traveling at an excessive rate of speed immediately prior to the accident, holding that such excessive speed was not a proximate cause of the accident.
The law is well settled that the driver on the right of way thoroughfare is ordinarily entitled to presume that drivers from side streets will not enter on the superior thoroughfare in his path, especially' when he knows that a stop sign inhibits entrance from the inferior street. This preference created by statutes or by signals or stop signs on a favored street does not relieve the driver traveling on the favored street from the duty of exercising ordinary care of having his car under control and operating it at a reasonable and proper rate of speed while approaching an intersection and while crossing it. Miller v. Abshire, La.App. 1st Cir., 68 So.2d 143, and Bahry v. Folse, La.App. 1st Cir., 83 So.2d 912. The degree of care imposed upon the driver on the superior thoroughfare *536 increases when he approaches an intersection of unusual and irregular design, and which he knows to be dangerous. When the superior motorist should reasonably realize in time that the inferior traffic will continue its approach and will obstruct the superior motorist’s passage across the intersection, he is guilty of negligence should he fail to take every precaution to avoid a collision. Comeaux v. Blanchet, La.App. 1st Cir., 69 So.2d 527.
As stated by the lower court in this case, each case must be decided on its peculiar set of facts and circumstances. In a case of this type it is necessary that we first consider the locus in quo upon which there is generally little dispute. We then must consider the testimony of the persons who witnessed the accident plus the physical facts at the time of and following the accident in an endeavor to ascertain how the accident occurred. We then must apply the law to the case to determine the responsibility for the accident. The district court and the court of appeal in their opinions fully discussed all of the testimony adduced on the trial of this case. We have considered the testimony and the analysis of same by each court. We have also considered the authorities cited by each court, and after a complete analysis of the case we are unable to agree with the opinion of the court of appeal insofar as it exonerated Miller, the driver of defendant company’s bus, from negligence. Of course, it is immaterial as ■to the degree of negligence by Miller buf, in our opinion, Miller was negligent and his negligence was one of the proximate causes of this tragic accident for which his employer is answerable in damages. Miller was not made a defendant.
The evidence reveals that the stop sign controlling traffic on Winn Avenue was located 48 feet from the intersection of Winn Avenue and Goodwood Avenue and 55 feet from the point of impact. It was also shown that a driver approaching Winn Avenue traveling west on Goodwood Avenue (the direction of the bus) had a visibility of 122 feet down Winn Avenue at a point on Goodwood Avenue 90 feet from the intersection of the two streets. This intersection was a particularly dangerous one, not only, because of the heavy traffic, but because Winn Avenue and Sevenoaks Avenue enter Goodwood from the north at sharp angles while Sevenoaks Avenue continues across Goodwood forming a five-corner intersection.
Miller, the bus driver, admitted that he had been assigned the bus route past this intersection for over a month and knew it to be a dangerous one, having noted that it was heavily patrolled by the police. Further, his statement that he did not know there was a stop sign at the intersection of Winn Avenue and Goodwood Avenue indicates that he did not rely upon it.
On the bus at the time of the collision were two ladies, both seated approximately *538 six feet to the rear of the driver, one on the first left cross seat and one on the right. Both these witnesses, who were under no duty to keep a lookout, testified that they observed the Plymouth before it reached the stop sign and realized that it was not slowing down for the stop sign and would enter the intersection without stopping. Although these two witnesses could not approximate in feet the distance at which they first noted the Plymouth, the fact that they realized before the car reached the stop sign that it should have been slowing down indicates that the car was more than 48 feet from the intersection. Both witnesses believed that the car and the bus entered the intersection simultaneously.
On the other hand, Miller, who was under a legal duty to maintain a proper lookout and who was in a superior position to the bus passengers to see the approaching car, was rather vague as to when it first came into his view. At one point in his testimony he stated that he first saw the automobile a fraction of a second before he hit it. At another time he claimed that the bus was one bus length (approximately 30 feet) from the intersection when he first saw the car, and the car was closer to the intersection than the bus. Later he testified as follows :
“Q. Now did you see the car from that time up to the time that the actual accident happened? A. Well, when I first noticed the car it was just an ordinary car, you know. People pull up to a corner, and most of them depend primarily on their brakes, that’s all you have to depend on, and they just fly up to the corner and stop. So when I first noticed him he was far enough back' he was just an ordinary car, but by the' time I got close to him I realized he wasn't going to stop.
“Q. Well, did you see him though, is my question? Did you keep on watching him from the time you first became aware of his presence up to the time that the accident happened? A. No, not exactly.”
It is evident from a reading of Miller’s testimony that the trial judge correctly inferred therefrom that Miller assumed the attitude that when one has driven a bus as much as he has, one becomes indifferent and calloused to traffic entering 1 intersections from side or less favored streets. When Miller was asked why he did not see the Plymouth sooner, he answered: 1
“Well, I can’t answer that part of it because when you drive as much as I was driving at that time, people have a habit of flying up to a corner on all streets, which I think most of you will agree with me, that they will just fly up to a corner and just depend on their brakes primarily to stop them. If their brakes don’t stop them they just don’t stop, and if you’re not expecting the *540 car to keep on going, why should you expect to stop at that time.”
Upon being questioned further as to why he did not see the car sooner, Miller replied, “You probably could have if you had been looking specifically for a car.”
The court of appeal, concluding that Miller had observed the car and realized the danger when the car was 60 feet more or less from the intersection, held that Miller, “being on the superior street with a stop sign located 48 feet from the intersection on Winn Avenue for motorists approaching this intersection along that avenue had the right to rely on the assumption that the Randall car would respect the stop sign and accordingly he had the right to proceed but exercising the ordinary and due care which the law imposed upon him, he saw that the Randall automobile prior to the time it got to the stop sign did not intend to honor the stop sign by stopping, and realizing the danger, exercised the obligation of reasonable care imposed upon him by immediately applying his brakes and swerving his bus to the left in an attempt to avoid the collision.” [114 So.2d 110.] Further, the court stated that Miller was under no duty to look for cars' 90 and 100 feet farther from the intersection as he approached it and is charged only with the normal observation which would be to watch out for approaching traffic as he neared the intersection and as it neared the intersection, Miller’s duty to anticipate that Randall could not stop before entering the intersection not arising until after the car had passed the stop sign, although Miller testified that he did not even know there was a stop sign on Winn Avenue.
We cannot agree that Miller exercised the ordinary care due under the circumstances of the case at bar. Miller’s awareness of the danger inherent in passing this intersection exacted a greater degree of care than would be expected of a motorist on the superior thoroughfare under normal conditions. Because he did not know there was a stop sign controlling traffic on Winn at its intersection with Goodwood, he certainly could not have anticipated that all traffic on Winn would stop before entering the intersection, and it was his duty to observe the traffic on that street as soon as it was possible for him to do so.
If the looking is at a time and in a space too short for the person looking to take action to prevent the impending peril discovered by the looking, then the duty to look becomes a vain and useless act and he need not have looked in the first place. We think that the duty of a motorist on a favored street to exercise ordinary care requires that he maintain at all times a proper lookout. A proper lookout means that he should see the obvious, and in this case it was obvious to the two passengers on the bus that Randall was not going to honor the stop sign on Winn Avenue.
*542 The bus driver stated that he probably could have seen the Randall car approaching at a distance of 90 feet if he had been looking specifically for a car. The duty to look does not specify that you look for any particular object, but requires that you look for any and all objects that might appear to impede or endanger your safe operation of your vehicle, even though the traffic engineers have accorded you the right of way and notified other motorists of that fact by the proper posting of signs indicating same.
 The law does not require and the courts have held in numerous cases that you are not called upon to anticipate that others will not heed and obey traffic lights, signs and laws, but on the contrary you have the right to assume that they will. Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292; Bahry v. Folse, supra; and White v. Travelers Insurance Company, La.App. 2nd Cir., 94 So.2d 564. However, when you look and see, or should have looked and could have seen, that another, by obvious actions is about to ignore the signs then it is your duty to protect him as well as yourself by using your best judgment under the circumstances and avoiding or minimizing any impending peril.
Due to the conflict in Miller’s testimony, it is impossible to decide whether he actually did observe the car sooner and then looked away until just before the moment of impact or whether he actually did not see the car until it was from 30 to 60 feet from the intersection. If he did observe the car as soon, as or soon after it came within his range of vision, he could have realized that it was not slowing down for the intersection and with its rate of speed of 30 to 35 m. p. h. could not stop before entering the intersection. The fact that he had the right of way did not relieve Miller of his duty to exercise reasonable care and caution to prevent an accident after actually seeing an approaching vehicle.
His testimony to the effect that most people fly up to the corner at intersections and then apply their brakes indicates that Miller did not consider it necessary to anticipate that a car might not be able to stop in time to avoid a collision until it had actually reached the intersection and did not take precautions to avoid a collision until that actual moment even though he might have noticed that the car was approaching too fast to stop. This is further borne out by the following testimony of Miller:
“Q. The record shows that the stop sign that confronted Mr. Randall was forty-eight feet from the north parallel lines of Goodwood Avenue. Now, if you had seen a car traveling out of Winn Avenue at say twenty miles an hour past the. stop sign, you wouldn’t stop your bus or slow it down, or take any action? In other words, if you see a car—a stop sign as far back as *544 this one, it was approximately about fifty-five or six feet from the point of impact, the stop sign confronting Mr. Randall. Now, if you were to see a car pass that stop sign at the rate— traveling at twenty or twenty-five miles per hour coming into the intersection, you wouldn’t take any action on the part of your bus to stop it? A. I would look at him, at least.”
And that, apparently, is what Miller did. All the evidence indicates that the Randall automobile was proceeding at the rate of 30 to 35 m. p. h. into the intersection and Miller took no other precaution than to “look at him, at least.” The fact that Miller, after passing this intersection several times a day for over a month, did not know that there was a stop sign on Winn Avenue only emphasizes his general lack of attention to traffic on less favored streets and his disregard of his legal duty to maintain a proper lookout and keep his vehicle under control at all times. We, therefore, conclude that Miller was negligent in failing to keep a proper lookout at the time of the accident.
Although the court of appeal agreed with the district court that Miller was driving the bus at an excessive rate of speed at the tinie of the collision, it concluded that “such excessive speed was not a'proximate cause of the accident because when the duty aróse to observe that the car was not going to respect the bus’ right of way (and also when such intention was actually observed), the accident could not have been avoided [even] if the bus was going at the legal rate of 30 m p h rather than its actual speed in excess thereof.”
A consideration of the particular facts and circumstances of this case compels us to reach a contrary conclusion. When the bus was 90 feet from the intersection and 97 feet from the point of impact, Miller should have begun to realize that the Randall car would not and could not stop before entering the intersection. Had Miller not been traveling at an excessive rate of speed, he would have had time to take some steps to avoid hitting the automobile; and the car would probably have cleared the intersection before the bus reached it. If, as the court of appeal concluded, the accident would have happened even had Miller been traveling within the speed limit, then he would have been negligent in maintaining the maximum speed past that intersection which he knew to be dangerous, heavily traveled and, to his knowledge, not controlled by a stop sign at-Winn Avenue
Accidents of this nature happen in a period of seconds or split seconds and oftime the results defy physics and logic. The speed of the bus was generally conceded to-be by both lower courts in excess of 40 m. p; h. Considering the size and weight of á bus of this type, it can readily be seen that *546 the impact of it against a small or lighter vehicle would cause greater damage according to the velocity or speed of the bus. The damages sought in this case are for the wrongful death of two children. We think it worthy of note that all three occupants of the lighter car were killed, which is indicative of a terrific collision. Had the bus been maintaining a lawful rate of speed as we have heretofore pointed out, the accident may have been avoided or, in any event, the damages could have been limited to property damages or less serious personal injuries than the fatal results which followed this collision.
One of the latest cases on this subject is the case of Veal v. Audubon Insurance Company of Baton Rouge, which coincidentally is reported in the same bound volume of the Southern Reporter as the opinion of the court of appeal in this case. The Randall case is found on page 98 of 114 So.2d, while the Veal[1] case is found at pages 648, 654, of the same volume. Incidentally, both cases were decided by the same appellate court, the Veal case decided just two months after their decision in this case. We have tried to distinguish the two cases but are unable to do so. While in the Randall case the court of appeal held the driver on the favored street to be free from negligence, they held just the opposite in the Veal case on the set of facts, as follows;
“Gremillion himself testified that he never saw the plaintiff Veal until he loomed up squarely in front of him, which means that he did not discover the peril when he should have, and was not keeping a proper lookout. The facts show that Gremillion was within 30 or 40 feet of the Veal automobile before he ever saw it in the intersection, although at this time the front end had practically completed the intersection.
“In order to determine whether the failure to keep a proper lookout was a proximate cause of the collision, we must determine the approximate location of the Veal car when Gremillion could and should have seen and realized that Veal was going to proceed into the intersection.
“Had Gremillion seen Veal stopping or coming to a stop several feet from the stop sign he could have continued on the assumption that Veal intended to honor his superior right of way. But under the testimony which the Jury and Judge heard Gremillion was more than the visual distance of 187 feet from the intersection when Veal stopped 21 feet south of the intersection at the stop sign and therefore had he looked when he arrived within the visual distance he would have seen Veal moving toward *548 the intersection, somewhere within 21 feet, and north of the stop sign. Veal’s speed was increasing rather than decreasing and Gremillion could and should have seen that Veal was not stopping for the intersection when he was more than 100 feet from the intersection. Gremillion’s failure to see Veal until the former was within approximately 40 feet of the point of impact constituted negligence and convicts him of a failure to keep a proper lookout. He could and should have seen Veal before the latter reached the intersection and realized that he was obviously not going to honor his superior right, and in any event he should have seen Veal when he actually entered the intersection. Had he observed Veal when he actually entered the intersection at a speed of 25 miles an hour, under the testimony which the jury and Judge heard, he would have had from 90 to more than 100 feet in which to avoid the accident, and according to the testimony at this speed he only needed 50 feet. If he was going 30 miles an hour he needed 66 feet. At either speed had he been keeping a proper lookout he could have and should have seen Veal when he actually entered the intersection, at which time there was more than sufficient distance between the two vehicles for him to have avoided the accident by either slowing or stopping his car. He had the last clear chance to avoid the collision.”
In our opinion the evidence in this case shows the driver, Miller, on the favored street in a less favorable position as to negligence than the driver, Gremillion, on the favored street in the Veal case.
We conclude that the Baton Rouge Bus Company, Inc., is liable to plaintiffs in solido with The Travelers Insurance Company because the excessive speed of the bus driver, his failure to maintain a proper lookout and his failure to have the bus under proper control constituted negligence which, with the concurrent negligence of Randall, was the proximate cause of the accident.
Finally for consideration is the award of damages to which plaintiffs are entitled. Plaintiffs claim that the court of appeal erred in reducing the awards made by the trial court inasmuch as the trend is to higher awards in Louisiana for the deaths of children. The only case in Louisiana courts cited to us, in which plaintiffs received a greater award than that awarded by the court of appeal in the instant case, was Watson v. McEacharn, La.App. 2 Cir., 1957, 99 So.2d 138. In that case the court of appeal increased the dis *550 trict court’s award from $7,500 to $12,500 to each parent for the death of a 20-year old son. Counsel for plaintiffs contend that merely multiplying that award by two in the present case to give $25,000 to each parent or $12,500 to each parent for each child would not be sufficient as the tragedy of losing two children at once is even greater than the sum of the two losses. In the Watson case, the mother was 46 and the father 51 years of age at the time of the death of their son who had been contributing heavily to the financial support of the family because of the partial disability of the father. In arriving at the sum of $12,-500 to each parent, the court made allowance for this support by the son. See Brooks v. State Farm Mutual Automobile Ins. Co., La.App. 2 Cir., 1956, 91 So.2d 403 ($10,000 to each parent for death of 15-year old boy); Himes v. Avinger, La.App. 2 Cir., 1956, 85 So.2d 304 ($3,750 to each parent for death of 3j4-year old girl); Bradford v. Wertz, La.App. 2 Cir., 1951 52 So.2d 47 ($6,000 [or a total of $12,000] to widow for deaths of two children in one accident, an 18-year old son and a 19-year old daughter).
Although no amount of money will compensate Mr. and Mrs. Randall for the loss of their two children, we feel that the awards made by the court of appeal are in line with other awards by Louisiana courts and, under the special circumstances of this case, are fair and adequate.
For the reasons assigned, the judgment of the court of appeal is reversed insofar as it held that the Baton Rouge Bus Company, Inc., was not solidarity liable with The Travelers Insurance Company; and there is now judgment in favor of plaintiffs and against Baton Rouge Bus Company, Inc., and The Travelers Insurance Company, in solido in the amount of $25,-481.61 for Kirby H. Randall and in the amount of $24,000 for Mrs. Evelyn L. Randall. All costs of these proceedings to be paid by defendants.

. Oertiorari denied November 9, 1959.