ELLIS, Judge.
The defendants have appealed and the plaintiff has answered the appeal seeking an increase in the award by the lower court to him as a result of a collision between the automobile of plaintiff and William J. Roberts, one of the defendants, at about 8:30 A. M. on a clear morning, on June 22, 1959 at the intersection of North Twenty-second Street and Main Street in the City of Baton Rouge, Louisiana.
The intersection in question is controlled by a semaphore light, green, yellow-caution, and red. The plaintiff approached the intersection travelling from the north to the south on North Twenty-second Street and stopped as the light was red. The light changed to green and he slowly moved forward, turning to the right on Main Street, and had reached a point eight feet south of the north parallel line of Main Street and one foot east of the west parallel line of North Twenty-second Street when the collision occurred between the plaintiff’s and the defendant’s automobiles. The point of impact was also twenty-one feet west of the center media of North Twenty-second Street. North Twenty-second street contains a strip of concrete dividing it in the center, either 12 or 24 inches in width, however, the width of North Twenty-second Street is given as forty-four feet. The plaintiff had almost completed his turn to the right on Main Street at the moment of impact as the main force was to the left front fender of his car, which struck the defendant’s car on its right side to the fore of its right front door. As the point of impact was only one foot east of the west parallel line of Main Street, the front of the defendant’s car had cleared the intersection and the front of the plaintiff’s car was within one foot of having cleared the intersection.
Although the defendant contends that he entered the intersection on a green light we are convinced that he entered on the red light. Defendant admits that the last time he looked at the light and it was green was as he cleared an intersection of the street to the east of North Twenty-second Street which he estimated to be a short block or approximately equal to a half block. The distance was not fixed as to this intersection by the defendant. How *455 ever, it is dear from the testimony that he never looked again at the light. There is no testimony as to how long the green had been on when he looked at it or saw it one-half block from the intersection of North Twenty-second Street. On the other hand, it is clear that the plaintiff came up to the intersection, stopped for a red light, waited until the light changed to green, then slowly pulled forward into the intersection, turned to his right and had gone eight feet south and within one foot of the east parallel line of Main Street when the accident occurred. We see no necessity in a detailed discussion of the testimony from the defendant’s standpoint as he was clearly negligent. The sole question in this case is whether the plaintiff was contributorily negligent and the burden was upon the defendant who plead such negligence. LSA-C.C.P. Articles 1005, 2164; Washington Fire & Marine Insurance Co. v. Fireman’s Fund Ins. Co., La.App., 130 So.2d 699; Delta Fire & Cas. Co. v. Bird, La.App., 121 So.2d 375.
Plaintiff relies upon the same cases as to the law controlling the rights of a motorist entering an intersection on a green light as cited and discussed by this court in the recent case of LeBeau v. Baton Rouge Bus Co. Inc., 136 So.2d 740. In this case we stated:
“ * * * It is well-settled in our law by the jurisprudence that a motorist, including a bus operator, approaching and entering an intersection controlled by a traffic signal or a stop sign, is entitled to assume that the signals will be understood and obeyed, and is not required to anticipate that other motorists will violate the law. Gautreaux v. Southern Farm Bureau Casualty Company, La.App., 83 So.2d 667; White v. Travelers Insurance Company, etc., La.App., 94 So.2d 564; Duree v. State, La.App., 96 So.2d 854; Steele [, etc.] v. State Farm Mutual Insurance Company, 235 La. 564, 105 So.2d 222; Henderson v. Central Mutual Insurance Company, 238 La. 250, 115 So.2d 339; Youngblood v. Robison, 239 La. 338, 118 So.2d 431; Randall v. Baton Rouge Bus Company, 240 La. 527, 124 So.2d 535, 543; Andrea v. Hicks, La.App., 125 So.2d 251; Smith v. Aetna Casualty and Surety Company, La.App., 128 So.2d 235, 237; Noonan v. London Guarantee and Accident Company, La.App., 128 So.2d 918, 919; McCoy v. State Farm Mutual Insurance Company, La.App., 129 So.2d 66, 69; Warner v. Insurance Company of State of Pennsylvania, La.App., 129 So.2d 320, 322; Patterson v. Hardware Mutual Cas. Co., La.App., 131 So.2d 147, 149; Benoit v. Vincent, La.App., 132 So.2d 75, 76.
“In Youngblood v. Robison, supra, our Supreme Court settled the law which has been followed by subsequent decisions. It stated [239 La. 338, 118 So.2d 433]:
“ ‘There is nothing contained in the testimony of Dr. Guice which warrants a holding that he failed to exercise ordinary prudence in his approach to and negotiation of the crossing. He was driving at a reasonable rate of speed and maintaining a general observation of the intersection. Thus, he had his car under such control as to meet and respond to any hazard which might be expected under normal conditions and this was all that the law required of him. He was not obliged, as the Court of Appeal indicates, to turn his head in the direction of traffic approaching from his left or right, or from both left and right, to ascertain whether someone might violate the law by running the crossing on a red light. On the contrary, he had the right, under our jurisprudence, to assume that the law would be respected.
“ ‘In Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849, 851, where a stop sign was involved, the Court said:
*456 “ ‘ * * * The motorist on the right-of-way street, with knowledge of the location of such a stop sign, has a right to assume that any driver approaching the intersection from the less favored street will observe the law and bring his car to a complete stop before entering the intersection, and such motorist can indtjjge in this assumption until he sees, or should see, that the other car has not observed, or is not going to observe, the law.’ ”
This rule has been cited and followed on several occasions, notably in Ryan v. Allstate Insurance Company, 232 La. 831, 95 So.2d 328; Steele, etc. v. State Farm Mutual Insurance Company, 235 La. 564, 105 So.2d 222 and Henderson v. Central Mutual Insurance Company, 238 La. 250, 115 So.2d 339.
“The above cited jurisprudence governing cases where stop signs were involved applies, a fortiori, to intersections controlled by electric semaphore lights. When an intersection is controlled by a stop sign, the motorist on the favored street, as stated in the Koob case, is entitled to indulge in the assumption that any driver approaching from the less favored street will bring his car to a complete stop before entering the intersection. Nevertheless, some slight observation of the other car must be exercised because the motorist on the less favored street, who has stopped in obedience to the stop sign, is entitled to proceed whenever it appears to him, as a reasonably prudent man, that it is safe for him to negotiate the crossing. But when a crossing is protected by an electric semaphore light it is not essential for the favored driver to look for violations by side-street traffic facing the red light for that traffic is not only required to stop but to remain stationary until the semaphore changes to green.
“This Court has given implied recognition to this distinction and has specifically held that it is not necessary for one intending to traverse an intersection on a green semaphore light to look to the left or the right before entering.
“In Kientz v. Charles Dennery, Inc., 209 La. 144, 24 So.2d 292, 295, a case very similar to this one, the Court refused to hold a truck driver proceeding on a green light guilty of negligence for failing to observe that plaintiff’s husband was not going to stop in obedience to a red signal light, which was not working at the time. In support of the ruling the opinion cited Manuel v. Bradford, La.App., 166 So. 657; Clark v. De Beer, La.App., 188 So. 517; Seiner v. Toye Brothers Yellow Cab Company, La.App., 18 So.2d 189 and Fitzpatrick v. New Orleans Public Service, La.App., 22 So.2d 473, and concluded by adopting with approval the following observations:
“ ‘We are living in an advanced stage of the motor age. Heavy and congested vehicular traffic on the streets and highways is a daily rule rather than an exception. In these circumstances, it is vital to the public interest that the traffic rules and regulations be adhered to strictly (particularly with reference to the traffic semaphore system) as the motorist is, to a large extent, compelled to operate his car in the belief that the law will be obeyed by others. Hence, in gauging the fault which is attributed to one, who was operating his car in obedience to positive law, the courts should be convinced that the dereliction was most substantial and that it was such a direct factor that, without it, the accident would not have occurred.’ ” (Emphasis added.)
We believe that the emphasized portion of the above quote is the rule which has been laid down by the Supreme Court of the State of Louisiana in deciding whether a motorist entering an intersection upon a green light has been proven guilty of contributory negligence — “ * * * that the *457 dereliction was most substantial and that it was such a direct factor that, without it, the accident would not have occurred.”
In the Youngblood case, supra, Justice McCaleb, as the organ of the Supreme Court, found the facts to be, in the main, as follows:
“ * * * When he was about a block away from the intersection of Linwood Avenue he noticed that the traffic light was red so he took his foot off the accelerator and slowed down. Upon reaching a point about 30 feet or more from the intersection the light facing him changed to green so he accelerated his speed and proceeded toward the intersection. At that time he was looking at the entire crossing and, because he had the right of way, he assumed that anyone travelling on Linwood Avenue would stop.2 Nevertheless, just as he neared the entrance of the intersection the lights of the approaching Robison car came into his line of vision and he immediately ‘hit the brake’. From the time the brake of the Guice car took hold until it reached the point of impact with the Robison car, which was four feet east and one foot south of the center of the intersection, the Guice car skidded 28 feet.
“There is nothing contained in the testimony of Dr. Guice which warrants a holding that he failed to exercise ordinary prudence in his approach to and negotiation of the crossing. He was driving at a reasonable rate of speed and maintaining a general observation of the intersection. Thus, he had his car under such control as to meet and respond to any hazard which might be expected under normal conditions and this was all that the law required of him. He was not obliged, as the Court of Appeal indicates, to turn his head in the direction of traffic approaching from his left or right, or from both left and right, to ascertain whether someone might violate the law by running the crossing on a red light. On the contrary, he had the right, under our jurisprudence, to assume that the law would be respected.
“Note 2. Linwood is a four lane two-way paved thoroughfare, 40 feet in width; Claiborne is a 30-foot two-way asphalt street.”
Counsel for the defendants takes the position “ * * * that Mr. Roberts had a perfect right to continue into the intersection if the light turned to amber just as he was entering it, as the Court apparently found to be the case.” Counsel cites in support of this position the case of Schindler v. Gage, et al., La.App., 59 So.2d 215, in which it was held that even if plaintiff entered an intersection on a green light in his favor, he should have allowed sufficient time for traffic, including defendant’s automobile which had entered the intersection on an amber light, to clear the intersection-
The District Court did state in its oral reasons for judgment, which were copied into the record at the time dictated, that he was firmly of the opinion that as the defendant Roberts entered the intersection “or perhaps a few seconds before he entered',, very few, perhaps, the light turned yellow on caution, and he proceeded to cross, and it turned red while he was under it.” We cannot agree with our learned brother below that the testimony shows or proves that the defendant Roberts entered the intersection on a caution light and that it changed to red while he was under it. It is plaintiff’s testimony that he did not turn his head to look to the right or to the left, but this he was under no duty to do as shown by the jurisprudence heretofore cited, but that he had a general view of the intersection when the light turned to green and as he started forward to enter the intersection and make his right-hand turn into Main Street, and that at that time the defendant’s car was not in the intersection. In addition, we have the testimony of two disinterested *458 witnesses, and particularly one, who testified positively that he saw the entire accident and that the defendant’s car entered the intersection on a red light which meant that the green light had turned to caution and then to red prior to the entry of the defendant’s car into the intersection. This witness was positive in his testimony and he was in a position to see. The defendant’s own testimony fails to ever show or prove how long the light had been on green when he was one-half block away, which was the first time that he observed the intersection, and he never looked again to see when the green light changed to caution or when the caution changed to red. The burden of proof was upon the defendant to prove the contributory negligence of the plaintiff, viz., that at the time the light turned to green and the plaintiff testified he had a general view of the intersection, that in truth and in fact, the defendant was at that time entering or had entered the intersection and that the plaintiff failed to see him. The testimony of the disinterested witness is to the effect that at the time the light turned green and the plaintiff started into the intersection that the defendant had reached the intersection and the light was red, but the witness could not definitely fix the distance of the defendant’s car from the intersection at the time he first saw it approaching the red light. There is no positive testimony as to whether the plaintiff was parked right at the line of the intersection or back from the line of the intersection and therefore it is impossible to determine within reason the distance the plaintiff travelled from his stopped position to the point of impact. The testimony shows the defendant was apparently driving at 15 to 20 miles per hour. The plaintiff started from a stopped position and had a general view of the intersection and testified that he did not see the defendant’s car therein when he started forward to make his turn, and he is corroborated by the disinterested witness that tne defendant was not in the intersection at that time for the latter had not reached the intersection until after the light had turned xed. There is no doubt that had the plaintiff turned his head to the left and looked past the intersection he would have seen the defendant approaching at approximately 15 or 20 miles per hour (although it is shown that the force of the impact bent the frame of the plaintiff’s car), but under the settled jurisprudence the plaintiff is not required to look to the right nor to the left when he has the green light, and, therefore, the failure of the plaintiff in this case to deliberately look past the intersection was not a substantial dereliction. We believe that had the defendant been in the intersection at the time that the light turned green and the plaintiff started forward, and had the plaintiff failed to observe the defendant, that the plaintiff would have been guilty of a substantial dereliction and that his failure to see the defendant within the intersection could constitute a direct factor, that “ * * * without it the accident would not have occurred.”
Under the settled jurisprudence established in the cases cited and the facts proven on the trial, the defendant has failed to bear the burden of proving that the plaintiff was guilty of contributory negligence.
Plaintiff was injured in the accident on June 22, 1959 and on that day he went to see Dr. Bernard who found him in extreme pain as well as on the second visit of June 23rd. The plaintiff suffered a whiplash type injury and also injury to the muscles in the back, but the x-rays showed no boney injury or abnormality. Dr. Bernard found muscular spasm and also severe pain until the 30th of June or approximately eight days, and thereafter he testified that the pain diminished, and on the 20th day of July 1959 he found the plaintiff completely asymptomatic except for complaints of stiffness. On the visit on the 20th of July he found no muscular spasm, and on July 22nd, 1959 he stated plaintiff was asymptomatic and had resumed work. Dr. Bernard prescribed a medicine for the relief of pain.
On July 1st, 1959 the plaintiff went to see Dr. Champagne, complaining of a hurting *459 in his neck and in the region of his lower back and a physical examination by this doctor included a finding of a 50% limitation of the rotation of the head to both sides and there was complete limitation of 'flexion of the head. He found a moderate spasm of the posterior muscles of the neck and tenderness in that region. The plaintiff described the stiffness in the back but there was no limitation of motion and no muscle spasm in the region of the lumbo-sacral spine. The doctor’s diagnosis at that time was sprain of the cervical spine, minimal sprain of the lumbo-sacral spine. He treated the plaintiff who returned for a visit to the doctor on July 7, 1959 and at this time plaintiff stated that his legs were stiff in the morning and his neck and back still hurt but the doctor found some moderate improvement. This doctor saw plaintiff again on July 14, 1959 at which time plaintiff stated he was having minimal tightness and stiffness in his back but that he was no longer having trouble with his neck. The doctor recommended that he return to light duty or work on July 20, 1959. This doctor saw the plaintiff for the last time on September 17, 1959 at which time the plaintiff told him he had returned to work as per his recommendation and since that time had lost no more time at work because of the disability and he stated that in the last few days prior to the visit he had an exascerbation of symptoms, which were much worse in the morning. The doctor treated him and advised him to return in approximately a week. On September 25th the doctor stated in a letter that his final diagnosis at that time remained as a strain of the cervical spine with a minimal sprain of the lumbo-sacral spine, and that he anticipated a complete recovery over the next several weeks, which would be characterized by intermediate periods of flare-ups and complete relief of disability.
Based upon this testimony the- Lower Court correctly found that the plaintiff had suffered what is commonly known as a whiplash injury together with some back injury and disability.
The Lower Court awarded him $2500.00 for his pain and suffering and injuries plus' special damages of $50.00 for the deductible on the insurance on his automobile, plus! $189.40 for loss of wages, $79.00 for the two-doctors’ bills, making a total of $2818.40, In addition the Lower Court fixed the expert witness fees of the two doctors who testified at $100.00 each.
Counsel for plaintiff has cited many cases involving whiplash injuries while counsel, for defendant has also cited three cases in-. volving whiplash injuries in which the awards were for $750.00, $1500.00, and $1150.00.
We have examined the authorities cited on this point, which total approximately 27 cases, and we believe that in the majority of cases, for a mild to moderately severe whiplash injury the award has been from $750.00 to $2500.00. The last amount was awarded in the case of Attaya v. Zimmerle, by this court in La.App., 83 So.2d 676. In this case the accident and injury occurred on March 5th, 1954, and plaintiff saw Dr. Gaudin on March 6th, 1954, and after examination he found that she had received a strain of the neck muscles as a result of the accident with no injuries to the bones, although she complained of pain in the neck, headaches, and the doctor found a limitation of movement of the head. On April; 24, 1954, the plaintiff saw Dr. Bannerman, an orthopedic surgeon, who stated that she had received a whiplash injury and that she had complained of tenderness, particularly on the right side of the neck in the muscaluture. Dr. Bannerman at this time found the motion was almost normal. Two days before the trial the doctor again examined plaintiff and found some slight restriction of motion. He diagnosed her case as “mild to.moderate” with no permanent injury and no evidence of nerve pressure. He testified that this type of injury usually cleared up within a few months and for them to last a year or a year and a half is not at all unusual but that the plaintiff’s injury was more prolonged than one would ordinarily expect. Dr. Foreman also *460 examined the plaintiff on March 21, 1955 and again on June 21, 1955. On his first examination he stated that he found plaintiff had tenderness to pressure over the left side of the back of the neck and along the base of her skull on the left side and down over the muscles at the top of the left shoulder and extending into the neck. She had a slight limitation of movement of the neck in certain directions and that on bending her neck forward was most limited at that time. She had moderate limitation of lateral tilting of the neck and of rotation of her head and any of these movements in the extreme ranges caused discomfort down the back of her neck on the left side. On the second examination his findings were essentially the same as the first and he found nothing in his examination that was inconsistent with her subjective complaints. He found no damage to nerves or nerve roots and that about a week before the trial, which was held on June 30, 1955, the plaintiff’s headaches were less frequent and less severe, and that in his opinion she had received a moderately severe whiplash injury.
The plaintiff in this case was given traction which was mostly applied by herself at home and a rubbing compound or salve and was told to take aspirin for relief of discomfort, and at the doctor’s office she was sometimes given Salimeth-C which was a little stronger than aspirin but is not such a sedative as is given in cases of severe pain.
It is also shown that the plaintiff in her work with the free lunch program was required to make frequent trips around the state during which time she did her own driving. She testified that after about two hours it was necessary for her to stop and take aspirin for the relief of pain which developed in her neck and for headaches. She also stated that whenever she sat in the same position for a couple of hours, headaches developed which required aspirin for relief. The doctors stated that the taking of long trips would cause such headaches, particularly considering her injuries. All of the doctors agreed that there was no permanent injury and her neck would clear up in due time, and that her injuries were not considered severe, but that her injury was prolonged more than was usual.
Based upon this evidence, this court found, and so stated, that the plaintiff had received a slight to moderately severe strain of the neck muscles and ligaments which caused her some extended discomfort. The plaintiff had been awarded in the Lower Court $7500.00 and this Court reduced the amount to $2500.00 under the testimony.
Plaintiff’s injuries in the case at bar could be described and evidently were considered as a mild to moderately severe whiplash injury by the Lower Court, and we therefore do not consider the award of $2500.00 as manifestly erroneous under the jurisprudence.
Affirmed.