McBRIDE, Judge.
Whalon Stewart, who sustained personal injuries while riding as a guest passenger in the automobile owned and driven by Zeb Lowe, as a result of a collision between that vehicle and a station wagon delivery-type automobile owned by Albert & Wegmann, Inc., brought this suit against Lowe, Albert & Wegmann, Inc., and the latter’s liability insurer, in solido,' for a large amount of damages. Plaintiff alleged that the accident occurred as a result of the joint negligence of his host Lowe and the employee-driver of Albert & Wegmann, Inc., who was at the time acting during the course and scope of his employment.
After a trial on the merits, plaintiff recovered judgment against all defendants, in solido, for the sum of $20,000, and Albert & Wegmann, Inc., and its insurer have prosecuted this appeal.
The collision took place on the night of January 10, 1959, in the intersection formed by the lake-bound traffic roadway of St. Bernard Avenue and the westbound traffic roadway of Mirabeau Avenue, each of which avenues has two lanes for traffic, these being separated by a wide neutral ground. The locus in quo is well lighted *233 and there are no obstructions to the view of motorists traveling on either thoroughfare. The only traffic controls at the intersection on the date of the accident were the official stop signs posted on St. Bernard Avenue which face motorists traveling thereon. The roadways were dry and visibility was good although Lowe maintained there was some fog in the vicinity.
Lowe and his passenger, the plaintiff, were unfamiliar with the streets of New Orleans. They had motored from the Mississippi gulf coast in order to visit a patient in Charity Hospital. Lowe did all of the •driving while plaintiff slept during most of the trip. When they reached New Orleans Lowe awakened plaintiff to discuss with him how they might find Louisa Street where Lowe’s sister lived, the reason for this being that Lowe did not know his way about New Orleans and desired to have one of his relatives accompany them as a guide and point out the way to the hospital. They could not find Louisa Street and were thoroughly “lost.” However, they continued their quest for the hospital. Lowe drove along St. Bernard Avenue toward the lake and upon reaching a point about three blocks before the Mirabeau intersection, he asked plaintiff what he should do and plaintiff advised a left turn at the “next big intersection.” Lowe states he traveled along at 35-40 miles per hour, and that after reaching the intersection of Mirabeau Avenue he slackened his speed to 12-15 miles per hour, his intention being to negotiate a left turn into the westbound roadway as plaintiff had directed. He admits driving past the stop sign facing him at the entrance of the intersection. He crossed the 34-foot wide eastbound roadway of Mirabeau'and then traveled 44.2 feet until he reached the westbound roadway, and just as he started his left turn, the right front corner of his automobile was struck by the left front part of the station wagon. Both vehicles were practically demolished; the driver of the station wagon was killed instantly; each vehicle traveled a distance of at least 80 feet after the crash.
The -only eyewitness was Lowe. Plaintiff knows nothing as he was “dozing.” After Lowe had crossed the eastbound roadway, he saw the lights of the station wagon at a distance of “100 feet or one block” away in the westbound roadway coming toward the intersection at a speed he estimated to be about “45, 40 miles per hour, maybe 50.” He later said the speed of the station wagon was “normal.” Although Lowe estimated the station wagon was “100 feet or one block” away, he clearly meant to convey that it was a block away. He stated he does not know “how far 100 feet would be,” and considering his testimony as a whole, it is clear he thought the car was one block removed from the intersection.
Lowe paid no further attention to the station wagon and was oblivious of its progress until the moment his automobile was struck as he was starting his turning movement.
The negligence of Lowe vel non is not before the court. What concerns us is whether there was negligence on the part of the driver of the station wagon who, plaintiff maintains, was operating his vehicle at an excessive rate of speed, failed to have it under proper control, and failed to keep a proper lookout. Appellants counter with the contention that plaintiff has not proven by a preponderance of the evidence that their driver was guilty' of any negligence which was a proximate cause of the accident. They point out that the stop signs on St. Bernard Avenue, as well as the provisions of the traffic ordinance of New Orleans, constituted Mirabeau Avenue a superior thoroughfare with the right of way over St. Bernard Avenue. Counsel argue that a motorist on a right-of-way thoroughfare is entitled to presume that the driver of a vehicle approaching the intersection from a less-favored street will observe the law and will not impede the path of the superior motorist and that the rule holds particularly true when the inferior motorist is observed slowing his speed as he approaches the intersection.
*234 The trial judge found as a fact that the intersection is located in “open country” and as we have already said, there was no obstruction or impediment to the view of either driver, and that each could have seen the other’s vehicle had he been looking. We do not know what the appellants’ driver saw as he approached the intersection. However, we must presume he was endowed with the normal sense of sight and that he actually saw what was there to be seen, to-wit: Lowe’s entrance into the intersection and his continued movement across the eastbound lane and his approach to the westbound roadway. Notwithstanding Lowe reduced his speed upon crossing the eastbound roadway, we do not believe that appellants’ driver should have assumed that he would stop before reaching the westbound roadway. Had the deceased driver been the least bit prudent, he should have had reason to anticipate that Lowe might enter said roadway without stopping. Such anticipation should have been prompted by the speed at which Lowe’s car was traveling and by the fact he had already ignored a stop sign. Even if it had been traveling at only 12 miles per hour, the lowest estimate given by Lowe, several feet would have been required for a stop, and when Lowe’s vehicle continued to a point near the westbound roadway, we think the deceased driver, who must also be presumed to have been an experienced chauffeur, should have realized that Lowe did not intend to stop for the westbound roadway. The deceased driver who was traveling in the lane adjacent to the neutral ground should have seen and known this in sufficient time to reduce the speed of his vehicle, apply his brakes, or to swerve over into the right-hand lane so as to avert running into the Lowe car. We think the deceased driver could have taken some effective step to avoid the collision. It seems to us this is clearly a case where the motorist with the right of way in his favor imprudently, and, unfortunately, relied too heavily on his superior position.
 The law is well settled that the driver of a vehicle on the right-of-way thoroughfare is entitled to presume that drivers from side roadways will stop and not enter on the superior thoroughfare in his path. This preferential status created by statutes or by signals or stop signs on the inferior street, however, does not relieve the driver traveling on the favored street from the duty of exercising ordinary care in having his car under control and operating it at a reasonable and proper rate of speed while approaching an intersection and while crossing it. When the motorist having the right of way should reasonably realize in time that the inferior traffic will continue its approach and will obstruct the superior motorist’s passage across the intersection, he is derelict in his duty, and thus guilty of negligence, should he fail to take every precaution possible to avoid a collision. Randall v. Baton Rouge Bus Company Inc., 240 La. 527, 124 So.2d 535.
The speed of appellants’ station wagon must come in for comment. The trial judge remarked in his reasons for judgment that the fact that the cars were demolished and that each traveled at least 80 feet after the impact indicated excessive speed. We do not know exactly how fast the station wagon was traveling, but we have before us a series of photographs of each of the vehicles made after the occurrence, and from these, which speak more clearly than any witness, 'it is plain to see that the collision was of terrific force and of such a nature as to render the front portions of the respective cars mangled and twisted masses of metal. The force was supplied by the station wagon which hit Lowe’s vehicle, and there is no question in our minds, nor could there be any doubt in any reasonable mind, that the deceased driver was traveling far in excess of the maximum speed of 35 miles per hour. Another circumstance which indicates the high rate of speed of the station wagon is that said vehicle traveled a *235 city block in the same period of time that it took Lowe, whose car was moving at 12-15 miles per hour, to negotiate the 44.2 feet between the eastbound and westbound roadways. The trial judge found that the deceased driver was guilty of negligence in that he traveled at an excessive speed, failed to keep a proper lookout, and neglected to apply his brakes in time to avoid the crash and that such negligence was a proximate cause of the accident. We are thoroughly in accord with these findings.
The plaintiff was knocked unconscious by the force of the collision and was taken in a police crash truck to Charity Hospital, it being feared at the scene that he might not survive until the arrival of an ambulance. Upon reaching the hospital he was so stuporous and had such respiratory difficulties that a tracheotomy was performed, and he did not regain consciousness until two days later. He sustained a depressed compound right frontal skull fracture with contusions of the cervix and dorsolumbar spine. His stay in the hospital was two weeks, and after returning home he spent an additional two weeks in bed. Then as the more critical aspects of the skull fracture diminished, the realization came that he was sub j ect to epileptic convulsions as a result of the injuries he had sustained. About six months later, thinking he was sufficiently recovered to attempt work, plaintiff made such attempt but was unable to carry out his duties because of convulsions and fainting spells.
The evidence shows that plaintiff has been subject to attacks of loss of consciousness every two weeks or so and on occasions he has sustained falls. The opinions of the examining and attending physicians are in accord and to the effect that plaintiff should refrain from activities which would endanger his life, such as driving an automobile and swimming. He should refrain from climbing ladders and otherwise being in elevated places where, if he would fall, he would endanger his life. He should refrain from all alcoholic beverages. He should avoid excessive fatigue and undue changes of climate. He should avoid excessive intake of fluids to prevent cerebral edema.
Plaintiff is an uneducated colored man 25 years of age who has a wife and four children whom he has been unable to support to any extent since the accident. He previously earned $75 per week. The judgment allowed him $20,000 and no complaint has been made by appellants as to the quantum. A reading of the transcript and the reports of the doctors so thoroughly convinces us of the seriousness of plaintiff’s injuries and his pitiable plight that it can be said with certainty that the award is not excessive.
For the reasons assigned, the judgment appealed from is affirmed.
Affirmed.