583 So.2d 531 (1991)
Angela DeROSIER, Plaintiff-Appellee,
v.
SOUTH LOUISIANA CONTRACTORS, et al., Defendants-Appellants.
No. 89-1353.
Court of Appeal of Louisiana, Third Circuit.
June 26, 1991.
Writ Denied October 18, 1991.
*533 Clanton & Johnson, John W. Johnson, and Young, Hoychick & Aguillard, M. Terrance Hoychick, Eunice, for Angela DeRosier.
Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, James E. Diaz, Jr., Tim McNamara, Lafayette, for Soloco.
Stockwell, Sievert, Viccellio, Clements & Shaddock, Thomas C. Henning, Lake Charles, for the State.
Before STOKER, LABORDE and KNOLL, JJ.
LABORDE, Judge.
This appeal arises out of a two vehicle collision occurring near Kinder, Louisiana, on May 1, 1985. Plaintiff, Angela DeRosier, filed suit against defendants, South Louisiana Contractors, Inc. (Soloco) and its insurer, Reliance Insurance Company of Illinois (Reliance), for injuries she sustained in the collision. By amending petition, the State of Louisiana, through the State Department of Transportation and Development (DOTD) was also made a defendant. Soloco and Reliance then filed a cross-claim against DOTD. A jury trial of this matter was held on March 6 through 11, 1989. In its verdict, rendered on March 11, 1989, the jury found the plaintiff to be 75% liable and Soloco and Reliance to be 25% liable for the accident. No liability was assigned to DOTD. The jury awarded plaintiff $4,176,127.01 in damages, which was reduced to $1,044,031.75 in the formal judgment in accordance with the percentage of fault assigned to the plaintiff. Both plaintiff and Soloco and Reliance filed motions for judgment notwithstanding the verdict which were denied by the trial court. Soloco and Reliance filed this appeal. The plaintiff and DOTD have answered the appeal. We amend the judgment to reduce the award against Reliance to its policy limits of $1,000,000.00 and affirm the judgment as amended.

FACTS
This accident took place at the intersection of U.S. Highway 190 and Louisiana Highway 383. At the intersection, La. 383 forks which permits eastbound traffic to continue straight towards Elton or to veer left and enter the westbound lane of U.S. 190. U.S. 190 is the favored roadway and traffic on La. 383 is controlled by a yield sign.
On May 1, 1985, at approximately 4:44 p.m., plaintiff was travelling in an easterly direction on La. 383 and veered left to enter westbound U.S. 190 traffic. In order for plaintiff to get into the westbound lane of U.S. 190, she had to first cross the eastbound lane and then the median which divides the two lanes of U.S. 190. As plaintiff approached the intersection, an eighteen wheel tractor-trailer rig owned by Soloco and operated by its employee, Carl J. Belleau, was proceeding in the eastbound lane of U.S. 190. The evidence clearly establishes that plaintiff never turned to see if there was any traffic travelling in the eastbound lane, nor did she stop or slow down at the yield sign. Mr. Belleau stated that at the point where plaintiff's truck reached the yield sign, he slammed on his brakes, sounded his horn and steered hard to his left. The two vehicles collided in the median area of U.S. 190. The front of the tractor impacted with the driver's side of plaintiff's pickup truck.
Trooper Harold Brady investigated the accident. He measured 106 feet of skid marks from the left side of the tractor-trailer and 33 feet of skid marks from the right. Plaintiff's vehicle travelled 117 feet after the collision and the tractor-trailer travelled a total of 144 feet.
Plaintiff sustained very serious injuries as a result of the accident. Mr. Belleau received minor injuries.

LIABILITY
The principal issue on appeal is the liability of the parties for the occurrence of the accident. Defendants argue that Mr. Belleau did not act negligently under the circumstances and that, therefore, the jury *534 was manifestly erroneous in assigning them any liability. On the other hand, in her answer to appeal, plaintiff contends that defendants' liability should be increased from 25% to 60%.
In Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), the Louisiana Supreme Court stated the following regarding the appellate review standard:
"It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of `manifest error' or unless it is `clearly wrong,' and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1973). See also, Sevier v. United States Fidelity & Guaranty Co., 497 So.2d 1380, 1383 (La.1986); West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owen, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Products Co., 364 So.2d 998, 999 (La.1978); A. Tate, `Manifest Error' Further observations on appellate review of facts in Louisiana civil cases, 22 La. L.Rev. 605, 611 (1962). The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux, supra at 1333, Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La. 1985)."
With these guidelines in mind, we will review the jury's liability findings.
LSA-R.S. 32:123(C) provides that:
"C. The driver or operator of a vehicle approaching a yield sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway. Having slowed or stopped in this manner, the driver shall yield the right of way to any pedestrian legally crossing the roadway on which he is driving, and to any vehicle in the intersection or approaching on another highway so closely as to constitute an immediate hazard."

* * * * * *
The jurisprudence of this state has consistently held that:
"... a motorist who is proceeding on a right-of-way street, upon approaching an intersection where traffic is required under a city ordinance, and is warned by stop signs, to come to a complete stop before entering the intersection, should not be held to the same degree of care and vigilance as if no ordinance existed or stop signs were erected. The danger at such an intersection is less than that at a corner where no stop signs have been erected, and therefore less care is required of the driver on a favored street. The motorist on the right-of-way street, with knowledge of the location of such a stop sign, has a right to assume that any driver approaching the intersection from the less favored street will observe the law and bring his car to a stop before entering the intersection, and such motorist can indulge in this assumption until he sees, or should see, that the other car has not observed, or is not going to observe, the law."
Koob v. Cooperative Cab Co., 213 La. 903, 35 So.2d 849, 851 (1948); see also, Henderson v. Central Mutual Insurance Co., 238 La. 250, 115 So.2d 339 (1959); *535 Hernandez v. State Farm Mutual Automobile Insurance Co., 128 So.2d 833 (La. App.3d Cir.1961). In other words, the driver on a right-of-way thoroughfare is ordinarily entitled to presume that drivers from side streets will not enter the thoroughfare in his path, especially when the driver on the right-of-way street knows that traffic on the side street is controlled by a stop or yield sign. However, when the motorist on the favored roadway, looks and sees or should have looked and could have seen that the motorist on the non-favored roadway, by obvious actions, is about to disregard a traffic sign, it is the favored motorist's duty to use his best judgment under the circumstances to avoid or minimize any impending peril. Randall v. Baton Rouge Bus Co., 240 La. 527, 124 So.2d 535 (1960). When the favored motorist should reasonably realize in time that the non-favored traffic will continue its approach and will obstruct the favored motorist's passage across the intersection, he is guilty of negligence should he fail to take every precaution to avoid a collision. Randall, supra; Spencer v. Hynes, 452 So.2d 1291 (La.App.3d Cir.1984).
Regarding a motorist's use of his vehicle's horn to warn of danger, LSA-R.S. 32:351(A) provides, in pertinent part, that:
"A. Every motor vehicle when operated upon a highway of this state shall be equipped with a horn in good working order.... The driver of a motor vehicle shall, when reasonably necessary to insure safe operation, give audible warning with his horn, but shall not otherwise use such horn when upon a highway of this state."

* * * * * *
There were two eyewitnesses to the collision who testified at trial: the driver of the tractor-trailer, Mr. Belleau, and a motorist who was following behind him on U.S. 190, Chuck Fontenot.[1] Carl J. Belleau had been operating eighteen wheelers for fifteen years prior to the accident. He had been working for Soloco for approximately eight months before the accident, and it was stipulated that he was in the course and scope of his employment at the time of the accident. In his deposition, Mr. Belleau stated that when he first saw plaintiff, she was five to six pickup lengths from the yield sign. At trial, however, Mr. Belleau testified that plaintiff was only two to three pickup lengths from the sign. Mr. Belleau explained the discrepancy at trial by stating that, in reviewing the accident scene after the taking of his deposition, he realized that his initial estimate of five to six lengths was too much. Mr. Belleau said that he continued to watch her during her approach to the yield sign, never taking his eyes off her and during that time she neither looked his way, nor did she slow her vehicle. Mr. Belleau estimated plaintiff's speed at eight to twelve miles per hour, or, perhaps, even faster.
Regarding whether he thought plaintiff was going to stop at the yield sign, Mr. Belleau first said, on cross-examination, the following:
"Q. Did Angela DeRosier do anything to make you believe that she was going to stop at that yield sign?
Q. No, sir.
Q. She never did anything? She slowed down? She never looked your way? Nothing to make you believe that she was going to make you stop?
A. No sir."
Later, on direct examination, Mr. Belleau testified:
"Q. When you first saw her, did you think that Miss DeRosier was going to stop?
A. Yes.
Q. What was it about her actions of the pick-up or herself that lead [sic] you to conclude that she wasn't going to stop? What was it about the next intervening period of time?
A. Well, at the rate of speed that the vehicle was coming and the distance that I was probably from the yield sign."
Again, on recross, Mr. Belleau stated:
"Q. During this two to three seconds from the time that you first saw her and *536 you said, she is going to stop to the time that you say that she's not going to stop, let me blow my horn, let me slam on my brakes, she was looking completely towards Elton, wasn't she?
A. Correct. She was looking to her right.
Q. She was not looking at you? You knew that she didn't see you?
A. Correct, sir.
Q. You knew that she wasn't slowing down.
A. Correct, sir.
Q. And you knew that there was a yield sign right there?
A. Correct.
Q. You also knew didn't you, Mr. Bellow [sic], that the minute she passed that yield sign, if she didn't turn and look, that you would not stop the truck in time to avoid hitting her, did you?
A. Correct, that's the reason why I started veering to the left."
Mr. Belleau was also inconsistent in his testimony concerning the point at which he took evasive maneuvers, i.e., braking, sounding his horn and steering to the left. He first informed the court that he honked his horn and slammed on his brakes when he first saw plaintiff, which was two to three car lengths from the yield sign. Subsequently, he testified that he waited until plaintiff reached the yield sign, a total of two or three seconds after he first saw her, before he honked his horn and slammed on the brakes. He further stated that he did not have time to blow his horn or hit his brakes before plaintiff reached the yield sign.
Chuck Fontenot also testified at the trial. He told the court that he had been following Mr. Belleau's vehicle for some distance and stated that he remained two to three car lengths behind the tractor-trailer as they neared the accident site. He said that he first saw plaintiff when she was quite a distance back from the yield sign. Mr. Fontenot further testified that when he first saw her he thought she would stop for the yield, but as plaintiff approached the yield sign she did nothing that would indicate that she was going to stop. Mr. Fontenot estimated plaintiff's speed at the approach to the yield sign to be between five and seven miles per hour. He stated that he knew she would not stop at the point where she was even with the yield sign. Mr. Fontenot testified that the tractor-trailer slammed on its brakes when plaintiff was even with the yield sign. When asked whether he heard Mr. Belleau sound the truck's horn, Mr. Fontenot responded in the negative.
At trial, the jury heard a great deal of testimony from expert witnesses for both sides. John Fitzwater, was accepted by the court as an expert in truck driving. It must be pointed out that Mr. Fitzwater was not permitted by the court to give his opinion on the standard of care required of professional truck drivers, but rather, he was only allowed to testify as to trade and industry safety standards. Mr. Fitzwater first testified that Mr. Belleau should have noticed plaintiff when she was further back. He also stated that he would have tapped his horn in order to get plaintiff's attention and he would have taken his foot off the accelerator at the point where Mr. Belleau first noticed that plaintiff was not looking at him and was not decelerating. Mr. Fitzwater testified that he would not have waited two to three seconds before taking evasive actions as Mr. Belleau did. He said that at every intersection where there is a vehicle coming from a less favored street, the driver on the superior street should begin taking evasive maneuvers when the driver on the inferior street is 100 feet away from the intersection. He noted, however, that in his estimation only fifty percent of truck drivers would follow that procedure. Mr. Fitzwater said that he would have slammed on his brakes and made a full emergency stop when the front of plaintiff's truck had passed the yield sign.
Defense witness, Olin Clark, testified as an expert in the field of truck driving. He stated that from his inspection of the scene, the accident could not have been avoided and no one could have handled the situation any better than Mr. Belleau did. Mr. Clark testified that in his opinion a *537 favored motorist does not need to brake until the non-favored motorist goes through a yield sign. Mr. Clark informed the court that a truck driver should use the horn to alert drivers when danger is imminent, that is, when a driver who does not appear to be paying attention approaches a yield sign at a high rate of speed. He testified that if Mr. Belleau never blew his horn, he made a mistake. As to whether he should have sounded the horn before a driver reaches a yield sign, Mr. Clark stated that if the non-favored driver is proceeding at twelve miles per hour, the horn should be sounded when the non-favored driver is one car length back, and if he is proceeding at twenty-five to thirty miles per hour, four to five car lengths back. If the driver is proceeding at five to ten miles per hour, Mr. Clark stated that the favored driver should prepare to take evasive maneuvers which would involve taking his foot off the accelerator, moving his foot to the brake and grabbing the horn. When asked on redirect and recross whether, Mr. Belleau properly reacted when plaintiff reached the yield sign, proceeding at Mr. Fontenot's estimated speed of five to seven miles per hour, Mr. Clark replied yes, if he honked his horn.
Dr. Davey Bernard also testified as an expert for the defense. Dr. Bernard was tendered and accepted as an expert in the field of physics and accident reconstruction. Dr. Bernard stated that in his opinion Mr. Belleau reacted at the proper time because plaintiff could have stopped before she reached the yield sign. He explained that there is no objective indication that a vehicle travelling ten miles per hour sixteen feet from a yield sign is not going to stop. Dr. Bernard theorized that plaintiff had the last opportunity to avoid the accident. When asked on cross-examination whether Mr. Belleau should have blown his horn before plaintiff reached the yield sign, Dr. Bernard replied that he did not feel that it was necessary.
A substantial amount of the testimony at trial concerned the speed at which Mr. Belleau was travelling prior to the accident. Trooper Harold Brady informed the court that the speed limit for the stretch of U.S. 190 where the accident occurred is fifty miles per hour. Mr. Belleau told Trooper Brady that he was driving forty miles per hour prior to the accident. In his deposition, Mr. Belleau confirmed that speed. At trial, Mr. Belleau stated that he was travelling between forty and forty-five miles per hour prior to the accident. Mr. Fontenot told an insurance adjuster on the night of the accident that he estimated Mr. Belleau's speed at between thirty-two and thirty-five miles per hour. At trial, Mr. Fontenot testified that his initial estimate was incorrect and that he would change it to between forty and forty-five miles per hour. Plaintiff's experts, James Robert Fister and Dr. Gerald D. Whitehouse, both testified, under their calculations, Mr. Belleau had to have been going more than forty to forty-five miles per hour, or, else the truck's brakes malfunctioned. In fact, Mr. Fister estimated that Mr. Belleau was travelling slightly over sixty-two miles per hour. Defendant's expert, Dr. Bernard, disputed Mr. Fister's estimate, stating that the physical facts do not support a finding that Mr. Belleau was travelling that fast, i.e., the damage to the pickup was not that severe and plaintiff survived the wreck. Dr. Bernard's calculations put Mr. Belleau at forty miles per hour.
After a careful review of the expert and lay testimony and the demonstrative evidence introduced at trial, we cannot say that the jury was manifestly erroneous in finding Soloco and Reliance to be 25% liable for the accident. The evidence presents a reasonable factual basis for finding that Mr. Belleau was negligent in not taking some evasive maneuver before the time when plaintiff reached the yield sign. The jury could have reasonably found that Mr. Belleau should have realized that plaintiff was going to disregard the yield sign and proceed into the intersection and he was negligent in not taking every precaution to avoid the accident. To conclude, we find no manifest error in finding plaintiff to be 75% at fault and Soloco and Reliance to be 25% at fault.
The jury found no liability on the part of DOTD. Specifically, the jury determined *538 that the intersection of U.S. Highway 190 and La. 383 did not possess a defect such as to make it unreasonably dangerous and which was a proximate cause of the accident. It is well-settled under Louisiana jurisprudence that DOTD is not responsible for every accident which may occur on a state highway, nor is it a guarantor of the safety of all travelers thereon. Generally, DOTD has a duty to construct and maintain highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence. United States Fidelity and Guaranty Company v. State, Department of Highways, 339 So.2d 780 (La.1976); Crochet v. Pritchard, 509 So.2d 501 (La.App.3d Cir. 1987); Beeson v. State, Through Department of Transportation and Development, 400 So.2d 278 (La.App, 3d Cir.), writ denied, 404 So.2d 1257 (La.1981).
We have reviewed all of the evidence pertaining to the intersection and find no error in the jury's finding of no liability on the part of DOTD.

PLAINTIFF'S OUTBURST
On the third day of trial, the following transpired:
"A. Okay. I think the nextwhere I stopped was, he thought the lady would look his way but she did not. She only looked for west bound traffic. The intersection is a fork intersection and a bit strange. He claims he blewpulled his horn and applied his brakes and veered to the left but could not avoid the impact and collided ...
MISS DEROSIER: No, he didn't. No. No. No. No. No. He didn't. No. He didn't. He didn't. He didn't. No. Let me alone.
THE COURT: Get the jury out. (Jury excused.)
MISS DEROSIER: Leave me alone. Mama, no, he didn't. He did not. Leave me alone. No. No. No. Daddy, I stopped. I swear I yielded. I stopped. I did, Mama. (Plaintiff escorted from the courtroom.)
THE COURT: I hate to impose this on the plaintiff, but I'm going to have to insist that from this point on that she's going to have to [be] excluded from the courtroom.
MR. DIAZ: Your Honor, since I'm about to cry myself I'm going to have to move for a mistrial simply to protect the interest of my client. And at the very least, I would have requested the instruction which you do intend to give which I would also ask, Your Honor, that the actual cassette tape being made by the court reporter be attached to the record so that it could be played for the court of appeal or the Louisiana Supreme Court should that become necessary in order that they may accurately identify exactly the emotional effect of the outburst that just occurred.
THE COURT: I will so order it. And I'm going toLet the record also reflect that the outburst had the impact of even causing the attorney for the defendant, Soloco, to cry. Despite this fact, I am going to deny the motion for mistrial and I will recall the jury in ten minutes or so and I'm going to instruct them that the trial is not to be decided on sympathy or on the actions of any persons in the courtroom. I'm also going to also impose an order that the injured party will have to remain outside of the presence of the jurors."
The trial court went on to so instruct the jury. On appeal, Soloco and Reliance argue that the trial judge erred in not ordering a mistrial and would have this court conduct a de novo review.
In Luquette v. Bouillion, 184 So.2d 766 (La.App.3d Cir.1966) and Begnaud v. Texas and New Orleans Railroad Co., 136 So.2d 123 (La.App.3d Cir.1961) this court held that emotional outbursts, weeping, fainting and like occurrences by a party do not in and of themselves constitute grounds for a new trial, and that the trial judge is in the best position to assess the prejudicial effect of such a display on the jury. In the absence of a clear abuse, the trial judge's sound discretion in denying a mistrial or new trial on such grounds will not be disturbed on review.
*539 We do not find that the trial court abused its much discretion in not declaring a mistrial or in not ordering a new trial. The medical evidence established that plaintiff is prone to such outbursts. We think the trial judge acted properly in quickly dismissing the jury from the courtroom and then, on its return, instructing it not to attach any significance to plaintiff's outburst and to decide the case on the evidence presented and not on the basis for sympathy for plaintiff. We, therefore, determine that a de novo review of the evidence is not called for.

EXPERT TESTIMONYERRONEOUS STANDARD OF LAW
Soloco and Reliance contend that the trial judge erred in allowing plaintiff's expert, John Fitzwater, to testify as to an erroneous standard of care. They allege that the jury verdict became "irrevocably tainted" by this incorrect standard and that a de novo review should be conducted.
The Louisiana Code Evidence sets out the scope of expert testimony. LSA-C.E. art. 702 provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
LSA-C.E. art. 704 states, in relevant part, that:
"Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact...."
At trial, the trial judge instructed plaintiff's counsel not to ask Mr. Fitzwater any questions about "conclusions of law or interpretations of law." Plaintiff's counsel was only permitted to ask the witness about trade and industry safety standards. We have conducted a thorough review of Mr. Fitzwater's testimony and do not find, as Soloco and Reliance allege, that he impermissibly commented on the standard of care or gave his opinion on an erroneous standard of care. We find that this argument lacks merit.

EXPERT TESTIMONYIMPEACHMENT
In their final argument for a de novo review, Soloco and Reliance contend that the trial court erred in not allowing the deposition testimony of James Fister to be introduced for impeachment purposes. They allege that Mr. Fister's deposition testimony regarding a tractor-trailer driver's reaction time is contradictory to his trial testimony on the subject.
LSA-C.C.P. art. 1450 allows for the admission of deposition testimony to impeach a deponent's credibility at trial. The decision of whether or not to allow the introduction of a deposition into evidence rests within the strong discretion of the trial judge, whose decision will not be reversed on appeal in the absence of a clear abuse of that discretion. Streeter v. Sears, Roebuck and Co., Inc., 533 So.2d 54 (La. App.3d Cir.1988), writ denied, 536 So.2d 1255 (La.1989). The reason the trial judge did not allow the deposition testimony to be introduced was that during his testimony, Mr. Fister referred to a diagram and counsel for defense and counsel for plaintiff could not agree as to what exactly the diagram was. Since Mr. Fister's testimony referred to the diagram and the diagram was unavailable at trial, the trial judge decided against admitting the deposition into evidence. We find no abuse of discretion in the trial judge's decision not to admit this portion of Mr. Fister's deposition testimony.

QUANTUM
Soloco and Reliance also take issue with the jury's damage award to plaintiff, arguing that the general damage award of $2,000,000.00 and the total economic loss award of $2,000,000.00 constitute an abuse of discretion. The assessment of damages is the province of the trier of fact, whose judgment is allowed great discretion and deference, and an award of damages cannot be disturbed unless the record on appeal clearly reveals *540 that the trier of fact abused its great discretion. Ponder v. Groendyke Transport, Inc., 454 So.2d 823 (La.App.3d Cir.), writ denied, 457 So.2d 1195, 1198 (La.1984). In reviewing a trial court's award of general damages, the reviewing court may not impinge upon the great discretion given the trier of fact on the issue of damages by replacing its award with one the reviewing court subjectively believes to be adequate. Sullivan v. Quick, 465 So.2d 254 (La. App.3d Cir.), writ denied, 467 So.2d 1134 (La.1985).
Plaintiff was eighteen years old at the time of the accident. She was a student at LSU-E, majoring in elementary education. By all accounts, she was a happy, active, outgoing person.
A review of the medical evidence establishes that as a result of the accident plaintiff suffered a closed head injury with multiple rib fractures and a pelvic fracture. Upon her admission to Lake Charles Memorial Hospital she was in a deep coma. Due to intercranial pressure, she was treated with various medications and procedures in an attempt to relieve the pressure. She has also had several surgical procedures to achieve some mobility in her left lower and upper extremities.
Plaintiff has permanent brain damage and functions at the borderline mentally retarded range of intelligence with a full scale IQ of 76. One doctor sees no real chance for improvement in this area. She suffers periods of agitated depression and has threatened suicide on a couple of occasions.
Her brain damage has caused paralysis on one side of her body (spastic hemiplegia). She has difficulty with speech, with opening her left eye and has some memory loss. Plaintiff also has a permanent lumbar shunt which diverts spinal fluid. Her left upper and lower extremity will never be fully functional and she has an estimated fifty to sixty percent anatomical impairment over her entire body. As one doctor succinctly put it, "she is a severely disabled survivor."
Plaintiff will probably need one more surgery on her left extremity. She may also require a shunt revision if the shunt valve becomes blocked. She will never be totally independent and will never be able to work in a competitive environment.
After reviewing the medical evidence, we cannot say that the jury abused its great discretion in its general damage award.
We have also thoroughly analyzed the evidence pertaining to plaintiff's total economic loss. The plaintiff's total economic loss award includes the following items: past attendant care, future medical and nursing expenses and attendant care and loss of earning capacity. While there is some difference of opinion among the experts in regard to the value of these various items, we find no abuse of discretion in the jury's award of $2,000,000.00 for plaintiff's total economic loss.
Soloco and Reliance would have this court strike the $5,000.00 award for property damage to the pickup truck. However, the trial court's judgment states that the property damage award is "in conformity with the stipulation by all the parties." Therefore, we uphold the property damage award of $5,000.00
Finally, in brief, Soloco and Reliance point out that the trial court's judgment does not conform to Reliance's policy limits of $1,000,000.00. We consequently amend the judgment to hold Reliance liable to plaintiff for $1,000,000.00.
The trial court's judgment is affirmed as amended. Costs of this appeal are assessed against South Louisiana Contractors, Inc. and Reliance Insurance Company of Illinois.
AFFIRMED AS AMENDED.
NOTES
[1] Plaintiff did not testify as to the events of the accident at the trial of this matter, as she claims that she has no recollection of the accident due to her injuries.